UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GWEN JEFFERSON                                    CIVIL ACTION
O/B/O  D.J.

VERSUS                                            NUMBER:  13-6094

CAROLYN W. COLVIN, ACTING                         SECTION:  "A"(5)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the

Court on the parties' cross-motions for summary judgment following a decision of the

Commissioner of the Social Security Administration denying Plaintiff's application for

Supplemental Security Income ("SSI") benefits.  (Rec. docs. 17, 18).

On July 15, 2011, Gwen Jefferson, grandmother of the Plaintiff-in-interest herein,

D.J., filed an application for SSI benefits on behalf of the minor child, alleging disability as of

January 8, 2010.  (Tr. pp. 135-144).  In a "Disability Report-Child" form that appears in the

administrative record below, Plaintiff's disabling condition was identified as ADHD.  (Tr.

pp. 145-150).  Plaintiff's application for SSI benefits was denied at the initial level of the

Commissioner's administrative review process on August 12, 2011.  (Tr. pp. 84-87).

Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge

("ALJ") went forward on May 16, 2012 at which Plaintiff, who was represented by counsel,

and her grandmother appeared and testified.  (Tr. pp. 50-75).  On July 13, 2012, the ALJ

issued a written decision in which she concluded that Plaintiff was not disabled within the

meaning of the Social Security Act.  (Tr. pp. 24-43).   The Appeals Council ("AC")

subsequently denied Plaintiff's request for review of the ALJ's decision on August 6, 2013, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 3-8).  It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g) and 1383(c)(3).

In her cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

I.     THE FINDING OF A LESS THAN MARKED LIMITATION IN ATTENDING AND COMPLETING TASKS IS CONTRARY TO LAW AND IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

II.    THE FINDING OF A LESS THAN MARKED LIMITATION IN INTERACTING AND RELATING WITH OTHERS IS CONTRARY TO LAW AND IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

(Rec. doc. 17-1, pp. 13, 19).

Relevant to the resolution of the matter at hand are the following findings that were made by the ALJ:

1.  The claimant was born on October 16, 1999.  Therefore, she was a school-age child on July 1, 2011, the date [the] application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2.  The claimant has not engaged in substantial gainful activity (SGA) since July 1, 2011, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairment:  Attention Deficit Hyperactivity Disorder (ADHD) and Learning Disorder (20 CFR 416.924(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. The claimant has not been disabled, as defined in the Social Security Act, since July 1, 2011, the date the application was filed (20 CFR 416.924(a)).

(Tr. pp. 30, 39).

Judicial review of the commissioner's decision to deny SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 590, 592 (5th Cir. 1983). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant, whether a child or an adult, bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Fraga*, 810 F.2d at 1301; 20 C.F.R. §416.912(a). In making a disability determination on a child, the Commissioner

utilizes the three-step sequential analysis set forth in 20 C.F.R. §416.924, as follows:

1.   determine whether the child engaged in substantial gainful activity during the relevant time frame and, if not;

2.   determine whether the child has a medically determinable severe impairment and, if so;

3.   determine whether the impairment meets, medically equals, or is functionally equal to an impairment set forth in the Listing of Impairments, Appendix 1, Subpart P, Part 404.

> *See Verrett v. Commissioner of*
> *Social Security*, No. 99-CV-3647
> 2001 WL 179922 at *1 n. 7
> (E.D. La. Feb. 20, 2001)

In determining whether a child's impairment is functionally equivalent to one of those set forth in the Listing of Impairments, the Commissioner considers the child's limitations in the following six domains:  acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and, health and physical well-being.  20 C.F.R. §416.926a(b)(1).  To be functionally equal to a listing and thus of listing-level severity, the child must have "marked" limitations in two of the six domains or an "extreme" limitation in one domain.  20 C.F.R. §416.92a(a).  In evaluating a child's ability to function in each domain, the Commissioner is to consider:  1) the activities the child is able to perform; 2) the activities the child is not able to perform; 3) which of the child's activities are limited or restricted compared to children of the same age who do not have impairments; 4) whether the child has difficulty with activities at home, in childcare, at school, or in the community; 5) whether the child has difficulty independently initiating, sustaining, or completing activities; and, 6) what kind of help the child needs to do activities, how much, and how often.  20 C.F.R. §416.926a(b)(2); *Maps ex rel. M.J. v. Astrue*, 09-CV-2226, 2010 WL 1946662

at *8 (N.D. Tex Apr. 30, 2010), *adopted*, 2010 WL 1948363 (N.D. Tex. May 13, 2010).

The documentary evidence that was generated during the relevant time period[1] begins with Plaintiff's fourth-grade LEAP scores from March of 2010 in which she scored below basic in reading and unsatisfactory in english, math, science, and social studies. (Tr. p. 220). On April 21, 2010, Plaintiff underwent a physical examination by Drs. McDermott and Moll of the LSU Healthcare Network Baptist Campus after she was sent home from school the previous day suffering from pharyngitis and a temperature of 100.6 degrees. As Plaintiff tested negative for both strep and mononucleosis, it was felt that her malady was likely viral in nature. Plaintiff was instructed to return if her symptoms became prolonged; her immunizations were updated. (Tr. pp. 240-243).

Plaintiff's LEAP scores for July of 2010 were unsatisfactory in both english and math resulting in her being held back in the fourth grade. (Tr. p. 220). Scores obtained in March of 2011 were below basic in reading, approaching basic in english, math, and science, and unsatisfactory in social studies. (*Id.*). Plaintiff's final report card for the 2010-2011 school year contained five "B's," one "C," and one "D" and during the fourth quarter she had increased her grade point average by one point. However, as a result of the poor LEAP test results, Plaintiff would have to attend LEAP summer remediation and retake the test in order to be promoted. She had been receiving support with modification and accommodation in language arts throughout the school year. (Tr. p. 180).

On June 13, 2011, Plaintiff returned to Dr. McDermott for follow-up of her ADHD

---

[1] Under 20 C.F.R. §416.912(d), the Commissioner is charged with developing the medical history of an SSI claimant "... for at least the 12 months preceding the month in which you file your application unless there is reason to believe that development of an earlier period is necessary ... " As Plaintiff filed her application for SSI benefits on July 15, 2011 and alleged disability as of January 1, 2010, which is over twelve months earlier, the relevant time period beings with the latter date.

and learning problems at school.  At that time, Plaintiff was attending summer school and was on the verge of repeating the fourth grade again.  Active problems were identified as ADHD, pharyngitis, and school phobia and the assessment was ADHD and school phobia. Plaintiff had no problems at home but did have learning difficulties and problems with self-esteem.  She was started on Vyvanse, was referred for a psychiatric evaluation, and was counseled on anti-bullying strategies.  (Tr. pp. 238-239).  Plaintiff returned to Dr. McDermott on July 12, 2011, having completed summer school and awaiting the results of her LEAP retest.  She had difficulties with math and reading but did well in science and spelling, receiving no additional help through the school system although she did get assistance from family members.   Both Plaintiff and her grandmother reported improvement in the former's concentration since starting on Vyvanse, paying better attention in class, writing more, and demonstrating an increased interest in learning.  In terms of behavioral issues, Plaintiff continued to have difficulty standing up for herself when picked on at school and she cried often but denied any depression and felt safe at home.  Her appetite had also increased since starting on the medication.  The assessment was ADHD and school phobia.  The importance of counseling and mental health support for Plaintiff were stressed to her grandmother.  (Tr. pp. 236-237).

On July 15, 2011, Plaintiff's grandmother completed the Administration's "Function Report-Child Age 6 to 12th Birthday" form that is designed to elicit information about how her conditions affected the performance of her usual activities.   There, Ms. Jefferson indicated that Plaintiff's speech could be understood only some of the time as she spoke in a very low volume but that she could deliver telephone messages, tell jokes or riddles accurately, explain why she did something, and use sentences containing "because," "what

if," or "should have been" but was unable to repeat stories that she had heard or talk with other family members or friends. She could read capital and small letters and simple words, read and understand simple sentences, print some letters and her name, and write a simple story of six to seven sentences but was unable to read and understand stories in books or magazines, write in cursive, spell most three to four-letter words, add and subtract numbers over ten, recall the days of the week or months of the year, make correct change, or tell time accurately. Explanatory comments included the fact that Plaintiff had failed the fourth grade and the LEAP test twice. Plaintiff's physical abilities were not limited. Despite checking off boxes on the form indicating that Plaintiff had friends her own age, could make new friends, generally got along with adults, and played team sports, it was explained that she did not defend or take up for herself, was teased or bullied by other children, generally played with younger children, and allowed older children to take over out of fear that they would physically assault her. It was also indicated that Plaintiff generally did not get along with her teachers. In terms of her ability to tend to her personal needs, Plaintiff could perform nearly all self-care activities except washing her hair or choosing clothes by herself and she generally heeded her grandmother's commands although she had to be told to do so repeatedly. However, Plaintiff was reportedly limited in her ability to pay attention and to stay on task, particularly at school where she would supposedly get up and run around the classroom. She was also known to stare a lot. (Tr. pp. 153-164).

Plaintiff's LEAP test results from July of 2011 were approaching basic in english and basic in math. (Tr. p. 220). Given the fact that she had already repeated the fourth grade, Plaintiff was moved on to the six grade for the following school year and an Individual

Accommodation Plan ("IAP") was later put into place in an attempt to address her issues. (Tr. pp. 71-72, 218). On August 8, 2011, an Administration examiner reviewed Plaintiff's file and formally requested further review and medical advice from a specialist in the field of mental impairments. (Tr. p. 244). On August 12, 2011, in conjunction with consideration of Plaintiff's application for SSI benefits at the initial level an Administration psychological consultant ("PC") reviewed Plaintiff's file and found that she suffered from a severe impairment in the form of ADD/ADHD, against which the PC considered whether that impairment was functionally equivalent to Listing 112.11. In the six above-referenced domains, the PC found that Plaintiff had a marked impairment in acquiring and using information, less than marked limitations in attending and completing tasks, in interacting and relating with others, and in caring for herself, and no limitations in the remaining two domains. (Tr. pp. 77-83). Functional equivalence not being established, Plaintiff's application for SSI benefits was accordingly denied at the initial level. (Tr. pp. 84-87).

On that same date, Dr. Lakisha Mamon of the Mercy Family Center performed a psychiatric evaluation of Plaintiff with the chief complaint being identified as Plaintiff's lack of knowledge on how to defend herself and her inability to interact with others beyond her grandmother and immediate family. Plaintiff, who was eleven at the time, presented to the evaluation with her grandmother who had had custody of her since the age of three weeks. Ms. Jefferson expressed concern over Plaintiff being bullied and subjected to physical aggression by her peers, concerns that were once reported to teachers but were no longer reported because they were not acted upon. Plaintiff was called names by her peers and Ms. Jefferson admitting to using words such as "retard" when referring to her. Perhaps not unsurprisingly, Plaintiff questioned whether she was "stupid, retarded" like her mother.

8

Ms. Jefferson also noted Plaintiff's poor academic performance, ADHD symptoms, sleep issues, and wanting to "play outside" all the time. ADHD symptoms at the time included poor attention, easy distractibility, not following directions, being fidgety, excessive talking, and being "on the go." She was also defiant and had a depressed mood and poor concentration.

In summarizing Plaintiff's medical history, Dr. Mamon noted that Plaintiff had started on Vyvanse the previous month but had experienced no improvement. Plaintiff denied any discipline problems at school and discipline at home in the form of privilege restrictions had been successful. On mental status examination, Plaintiff looked older than her stated age and although she was pleasant and cooperative, rapport was not easily established. She displayed poor eye contact, mild psychomotor retardation, monotone and non-spontaneous speech of a low volume, and a flat, although appropriate, effect. Plaintiff described her mood as "OK" and thought processes were goal-directed with no evidence of a thought disorder. Otherwise, the results of the examination were normal. The initial diagnostic impressions were as follows:  Axis I – attention-deficit/hyperactivity disorder (combined type), rule out borderline intellectual functioning, rule out learning disorder; Axis II – deferred; Axis III – none; Axis IV – problems with primary support group, social environment, and education; and, Axis V – a GAF of 65. The prognosis was said to be fair and the treatment plan included psychological testing to identify Plaintiff's educational needs, labwork, and a possible referral to therapy. (Tr. pp. 249-252).

Plaintiff returned to Dr. Mamon on August 22, 2011 for follow-up care. Some written rating tests had been completed by Plaintiff's grandmother and her morning teacher. Since the start of the school year one week earlier Plaintiff reported no issues or

problems with her peers and that her teachers were more responsive.  She felt more at ease in notifying her teachers when she was having problems.  However, Plaintiff was not receiving the ordered 504 accommodations, was noted to be situated in the middle of the classroom despite her distraction problems, and was not being removed during test time. Mental status exam revealed an "OK" mood, a flat but appropriate affect, goal-oriented but non-spontaneous thought processes, and fair judgment/insight.  The diagnosis remained unchanged and Plaintiff's condition was described as stable with a fair prognosis.  She was counseled on non-aggression and redirection strategies, was referred for testing to better pinpoint her problems, and was continued on Vyvanse.  (Tr. pp. 255-256).

Over the course of two days in September of 2011, Plaintiff underwent a psychological assessment by Dr. Lisa Tropez-Arceneaux of the Mercy Family Center to determine an accurate level of cognitive functioning.  Testing on the first day consisted of a parent interview, culture-free self-esteem inventories, and the Weschler Intelligence Scale for Children-IV ("WISC-IV").  (Tr. pp. 253-254).  Presenting complaints were identified as inattention, hyperactivity, low self-esteem, difficulty with being bullied at school, regression in behavior, and academic difficulties.

The day prior to the evaluation, Plaintiff's grandmother reported that Plaintiff had been involved in an altercation with two girls at school in which they slapped the glasses off of her face and stomped on them.  According to Ms. Jefferson, the Vyvanse that had been prescribed to Plaintiff had not resulted in any improvement to her symptoms.  A history of delay in the achievement of various developmental milestones was recounted and Plaintiff exhibited a "slow to warm up temperament."  Plaintiff's grandmother was her sole caregiver and legal custodian, as her mother was homeless and suffered from significant

medical problems and her father had low intellectual functioning, although he was employed.  Plaintiff had numerous siblings, most of whom she had no contact with and/or was unaware of their whereabouts.  She did, however, have a close relationship with an aunt.  Plaintiff's family history was positive for mental illness, substance abuse, significant medical problems, and depression and her parents had both struggled in school and received special education services.

Dr. Tropez-Arceneaux recalled Plaintiff's previous treatment with Drs. McDermott and Mamon.  Plaintiff enjoyed swimming, bike riding, watching TV, and playing on the computer.  Socially, Plaintiff longed for more friends and failed to understand why other children were antagonistic to her at school.  At the time, Plaintiff was enrolled in the sixth grade, having repeated the fourth grade after failing reading and math.  In the previous two years Plaintiff had struggled with reading, spelling, and math.  Her behavior at school had never been a problem.

Upon mental status examination, Plaintiff was observed to be neatly and appropriately dressed and groomed with good hygiene.  She was oriented x 4, rapport was easily established and maintained, and eye contact was appropriate.  Plaintiff often spoke in a soft, low voice with some articulation deficits, mispronunciations, and apparent grammatical errors.  Conversational abilities were appropriate but she required additional time to respond when posed unfamiliar questions or when asked to elaborate on details.  Plaintiff reported a saddened mood and demonstrated a flattened affect but thought processes were logical and goal-directed and insight and judgment were intact with no delusions, hallucinations, or suicidal or homicidal ideations.   Behavior was wholly appropriate and Plaintiff was capable of prolonged attention with occasional distractions

and she properly asked for and responded to assistance, and was polite and well-mannered.

On the WISC-IV, Plaintiff achieved scores placing her in the average range in all tested areas except for verbal comprehension in which she placed in the low average range. The latter test result was validated through the PPVT-4, in which vocabulary attainment was age-equivalent to 7.8 years and grade-equivalent to 2.1 – significant deficits which were likely impacting her academic performance and her ability to realize her educational potential.  In the WJ-III, although Plaintiff obtained scores in reading, math, and written language that ". . . appeared adequately and consistently developed," those scores fell ". . . within the range to meet the criteria for Mathematics Disorder and Reading Disorder."  In the Conners 3, a test designed to assess attention and concentration that was administered to Plaintiff, her grandmother, and her teachers, scores were obtained in the very elevated range for hyperactivity and impulsivity and in the high average range for difficulty in learning and remembering concepts, with an ADHD classification of 87% probability. BASC-2 scores were reflective of clinically significant difficulties with attention, hyperactivity, learning problems, executive functioning, task completion, and impulsivity.

In terms of social and emotional functioning, Plaintiff achieved scores at the clinically significant level in the areas of attitude toward school and teachers, indicating that she disliked school intensely and wished to be elsewhere and that she considered her teachers to be unfair, uncaring, and overly demanding.  Other results were suggestive of negative self-image, low confidence in decisionmaking, problem solving, and dependability, difficulty in establishing and maintaining close relationships, isolation, loneliness, sadness, and being misunderstood.

Based upon the various test results, Dr. Tropez-Arceneaux opined that Plaintiff met the criteria for a mathematics disorder and a reading disorder.  She also continued to meet the criteria for ADHD, combined type.  Symptoms of inattention and impulsivity were markedly noted throughout the testing.  Significant problems with self-image were present and Plaintiff was also experiencing some symptoms of depression that met the criteria for depression disorder, not otherwise specified ("NOS").  The multiaxial diagnosis was as follows:  Axis I – reading disorder, mathematics disorder, ADHD (combined type), and depressive disorder (NOS); Axis II – no diagnosis; Axis III – none; Axis IV – poor social interaction, severe bullying at school, academic difficulties, and strained family relationships; and, Axis V – a GAF of 65.  The prognosis was dependent on the duration and intensity of the treatment that Plaintiff may receive to address her considerable history of significant learning difficulties.  Dr. Tropez-Arceneaux made a host of recommendations to combat Plaintiff's problems and suggested revision of her IAP to incorporate those recommendations.  (Tr. pp. 257-269).

In between the two psychological testing sessions, Plaintiff had returned to Dr. Mamon for further follow-up care on September 16, 2011.  Like she had related to Dr. Tropez-Arceneaux, Plaintiff reported having recently been "jumped" by peers at school and having her glasses destroyed.  Plaintiff was having no side effects from her Vyvanse but some issues with inattention and hyperactivity were reported by her teachers.  A mental status examination revealed a flat affect and fair judgment/insight but was otherwise unremarkable.  Plaintiff's condition was said to be stable but the dosage of Vyvanse was to be increased to what would hopefully be a more effective level.  (Tr. pp. 247-248).

Plaintiff was next seen by Dr. McDermott on October 4, 2011 for additional follow-

up and updated immunizations.  Ms. Jefferson reported that Plaintiff's grades had improved since she was held back and started on Vyvanse with no side effects.  Plaintiff also complained of a two-day history of a dry cough, runny nose, sneezing, and a sore throat. The assessment was a normal routine physical, ADHD, and school phobia.  Details of the treatment plan indicated that Plaintiff's grades were improving and that her affect was good that day and although she was still getting picked on at school she was sticking up for herself more and arrangements were being made for her to relocate to a different school. Numerous vaccinations were administered.  (Tr. pp. 276-277).

On November 3, 2011, a new IAP was implemented following a meeting with Plaintiff's grandmother and input from various school personnel including a social worker, special educator, and counselor.[2/]   Areas of concern to be addressed were reading/language arts difficulties, mathematics difficulties, and social behavior problems. Plaintiff was to be screened for a language disorder and was continued in reading intervention.  (Tr. pp. 215-217).  On December 2, 2011,[3/] Plaintiff returned to Dr. Mamon and was characterized as doing "very well" by her own report and that of her grandmother. After the results of the recent psychological testing had been provided to Plaintiff's school officials she had begun receiving special services in reading and mathematics, resulting in an improvement of her grades, attention, and focus.  The bullying had also abated as the school had taken a more active role on that issue.  Plaintiff was seeing a therapist weekly at school, her grandmother inquired about services that were available at the Mercy Family Center to help with depressive issues, and Dr. Tropez-Arceneaux was consulted about

---

[2/] One of the school records from this date indicates that Plaintiff was at that time in the fifth grade while  a second one identifies her grade level as the sixth grade.  (Tr. pp. 215, 217).
[3/] The calendar year on this treatment note was incorrectly identified as 2012.  (Tr. p. 273).

therapy.  Upon mental status examination, Plaintiff was calm and cooperative, mood was "OK", affect was flat but appropriate, thought processes were goal-directed but not spontaneous, and judgment/insight were fair.  The assessment was that Plaintiff was "stable and improved."  After consulting with Dr. Tropez-Arceneaux it was decided that there was no need for additional therapy outside of school as Plaintiff's depressive symptoms appeared related to the bullying and educational frustrations.  Vyvanse was continued.  The final diagnosis remained unchanged except that Plaintiff's GAF had gone up to 75.  (Tr. pp. 273-274).

Plaintiff's IAP was updated on January 16, 2012 and she was afforded a wide range of accommodations in math, reading, composition, english, spelling, science, and social studies.  In the upcoming iLEAP test, Plaintiff would be allowed extended time, individual and small group administration, assistive technology, and the reading aloud of the test material.  (Tr. pp. 212-214, 219).  When Plaintiff returned to Dr. Mamon on March 12, 2012, Ms. Jefferson reported an increase in Plaintiff's behavioral issues in the form of walking around in class and yelling "hello" and generally "being the class clown."  Plaintiff was unable to explain why her behavior had changed, she denied any issues with mood or anxiety, and bullying was not an issue at that time.  She was earning "C's" and "D's" in school and was receiving additional services in class.  The mental status examination results were the same as the previous occasion.  The assessment was an increase in ADHD symptoms, likely hyperactivity and impulsivity.  Supportive therapy was employed and the dosage of Vyvanse was increased to 40 mg.  The diagnosis was unchanged except for a decrease in Plaintiff's GAF score to 70.  (Tr. pp. 271-272).  Her school grades for the third quarter were two "C's," three "D's," and an "F."  (Tr. p. 211).

On March 27, 2012, Plaintiff's teacher reported that Plaintiff was working well below grade level and required extended time and a small group setting. A dyslexia and dyscalculia checklist was completed. (Tr. p. 210). The following day, Plaintiff was given a one-day suspension after throwing another student's uniform down the drain. (Tr. p. 209). Speech and language screening and vision/hearing screening were to be scheduled on March 29, 2012 and intervention and counseling were to be continued. (Tr. p. 208).

As noted earlier, a hearing *de novo* before an ALJ went forward on May 16, 2012. After the documentary exhibits were admitted into evidence Plaintiff's attorney gave an opening statement in which he argued that in addition to a marked limitation in acquiring and using information that had been found by the Administration's PC, Plaintiff also suffered from marked limitations in the domains of attending and completing tasks and in interacting and relating with others. Plaintiff then took the stand and was questioned by the ALJ. She was twelve years of age at the time and was nearing completion of the sixth grade with advancement to the seventh grade expected to occur. When asked what grades she had earned that school year, Plaintiff identified "C's," "D's," and "F" but recalled getting "A's" and "B's" in others. The "F's" had been earned in math and reading, subjects Plaintiff testified that she received no assistance with and in which her teachers failed to respond to her questions. However, her grandmother did assist her with homework. Plaintiff testified that she found school difficult and was experiencing problems with bullying which had improved when she talked with adults about it. Otherwise, school officials were not particularly responsive to Plaintiff's requests for assistance.

Continuing, Plaintiff testified somewhat inconsistently that the bullying at school had stopped. She took medicine once a day to help with concentration which was effective

only some of the time.  Plaintiff testified that she had a number of friends at school and that she had neighborhood friends with whom she played.  She had a cellphone that she used to talk and exchange texts with friends.  Plaintiff saw Dr. Mamon, whom she liked, for her attention and bullying problems.  (Tr. pp. 52-63).

Plaintiff's grandmother was the next witness to take the stand.  She testified that at the beginning of the school year, Plaintiff's academic performance was more acceptable but that it had tapered off since then.  Plaintiff had been promoted from the fourth grade to the sixth grade as a result of a waiver, the 504 Program that she had been placed in had not improved her performance, and it was doubtful that Plaintiff was going to advance to the seventh grade.  In fact, Ms. Jefferson testified that the only action that the school had taken to address Plaintiff's deficiencies was to fire several teachers and that she was thus taking steps to have Plaintiff transferred to a different institution.  Somewhat inconsistently, Ms. Jefferson then testified that "I've had them talk to me about that . . . just a lot of social workers and all, your know, we are all working with her to get it, but she's not doing very well.  She's just not focusing and, you know, she's not able."  When pressed for further details, Ms. Jefferson testified that a social worker met with Plaintiff on a weekly basis to talk about the bullying that she had once been subjected to but which had since abated.  Contrary to what Plaintiff had testified to, Ms. Jefferson indicated that Plaintiff had no friends at school.  She did, however, have a new neighbor whom she played with after school.  Ms. Jefferson then recalled Plaintiff's treatment with Dr. Mamon.  Although the prescribed Vyvanse initially provided some relief, it was no longer effective.  (Tr. pp. 63-68).

Upon being tendered to Plaintiff's attorney for further questioning, Ms. Jefferson

17

testified that Plaintiff had recently been involved in an incident at school in which she attempted to intervene in a physical altercation between two other classmates but was wrongfully perceived to be the one of the combatants, resulting in her having to defend herself at an expulsion hearing and being placed on probation for the remainder of the school year.  Contrary to what Plaintiff had testified, Ms. Jefferson indicated that there were no classes that Plaintiff had done well in except for enrichment which was not a substantive academic course.  Plaintiff's school had not followed through with small class placement as was called for by the 504 Program.  Math and reading continued to be a problem for Plaintiff even during the period when the Vyvanse was more effective.  Deficits in comprehension and focus affected Plaintiff both at school and at home and she consistently tested poorly.  Ms. Jefferson explained that after Plaintiff had repeated the fourth grade the school granted her a waiver and passage to the sixth grade as she was "too big" to repeat the fourth grade yet again.  According to Ms. Jefferson, Plaintiff preferred to socialize with children younger than herself because they were less of a threat.  Other than one or two relatives, Plaintiff had no friends with whom she communicated via text messaging and age-equivalent peers referred to her in derogatory terms like "idiot."  (Tr. pp. 68-72).

Additional questions were then posed to Ms. Jefferson by the ALJ.  Plaintiff had been going to her present school for five years and although she had been evaluated for placement in special education classes, she had not been placed in any such classes.  While Plaintiff came across as quiet and withdrawn at school she was known to "act out" at home with Ms. Jefferson because of their familiarity.   Ms. Jefferson was unaware of the whereabouts of Plaintiff's mother, who suffered from mental illness, and Plaintiff's father (Ms. Jefferson's son) was last known to be in the Dallas area.  The hearing was then

concluded.  (Tr. pp. 72-75).

Plaintiff's first challenge to the Commissioner's decision is that the ALJ's finding that Plaintiff had less than a marked limitation in attending in completing tasks is contrary to law and is unsupported by substantial evidence.  As will be discussed, *infra*, because the Court believes that Plaintiff's first challenge to the Commissioner's decision has merit, a discussion of Plaintiff's second challenge will be pretermitted here.

As noted earlier, functional equivalence is determined by assessing the degree of a child's limitations in six domains, with listing-level severity being established if the child has "marked" limitations in two of the six domains or if the child has an "extreme' limitation in one domain.  20 C.F.R. §416.926a(a).  A marked limitation exists when an impairment or combination of impairments interferes seriously with the child's ability to independently initiate, sustain, or complete activities.   20 C.F.R. §416.926a(e)(2)(i).  A child's day-to-day functioning may be seriously limited when her impairments limit only one activity or when the interactive cumulative effects of her impairments limit several activities.  *Id.*  A marked limitation is one that is more than moderate but less than extreme. *Id.*  No one piece of information can be viewed in isolation in determining whether a particular limitation is marked.  20 C.F.R. §416.926a(e)(4).

In the domain of attending and completing tasks, the Commissioner considers how well the child is able to focus and maintain her attention and how well she begins, carries through, and finishes her activities, including the pace at which she performs activities and the ease with which she changes them.  20 C.F.R. §416.926a(h).  The relevant portions of the Commissioner's functional equivalence Regulation provide the following guidance in the domain of attending and completing tasks:

(1)     *General.*  (i) Attention involves regulating your levels of alertness and initiating and maintaining concentration.  It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance.  This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed.  It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.

(ii) Adequate attention is needed to maintain physical and mental effort and concentration on an activity or task.  Adequate attention permits you to think and reflect before starting or deciding to stop an activity.  In other words, you are able to look ahead and predict the possible outcomes of your actions before you act.  Focusing your attention allows you to attempt tasks at an appropriate pace.  It also helps you determine the time needed to finish a task within an appropriate time-frame.

20 C.F.R. §416.926a(h)(1).

The Regulations then set forth the following pertinent age group descriptors for evaluating functional equivalence in the "attending and completing tasks" domain as well as some examples of limited functioning in that area:

(iv) *School-age children (age 6 to attainment of age 12)*.  When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments.  You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments).  You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate.  You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores.  You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

(v) *Adolescents (age 12 to attainment of age 18)*.  In your later years of school, you should be able to pay attention to

increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects.  You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments.  In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

(3) *Examples of limited functioning in attending and completing tasks.*  The following examples describe some limitations we may consider in this domain.  Your limitations may be different from the ones listed here.   Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one.  As in any case, your limitations must result from your medically determinable impairment(s).  However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.

 (i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.

 (ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.

 (iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.

 (iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.

 (v) You require extra supervision to keep you engaged in an activity.

20 C.F.R. §416.926a(h)(2)(iv),<br>(v) and (h)(3).

Providing further guidance in evaluating functional equivalence is Social Security

Ruling ("SSR") 09-4p which provides that

[t]he need for frequent prompting demonstrates that the child is not paying attention as appropriately, effectively, or independently as children of the same age who do not have impairments.  Despite the fact that the child is paying attention with prompting, this child is not functioning well in this domain.

SSR 09-4p, 2009 WL 396033 at *2.

SSR 09-4p further instructs that "[c]hildren with attention-deficit/hyperactivity disorder (AD/HD) whose primary difficulty is inattention may be easily distracted or have difficulty focusing on what is important and staying on task." *Id.*  In addition, "[c]hildren with AD/HD whose primary difficulty is hyperactivity and impulsivity may fidget with objects instead of paying attention, talk instead of listening to instructions, or get up from their desks and wander around the classroom beyond what is expected of children their age who do not have impairments." *Id.* at *3 (footnote omitted).

Relevant to the matter at hand is the additional, following language in SSR 09-4p which discusses the effects that deficits in the domain of attending and completing tasks may have with limitations in other domains:

> ... school-age children with AD/HD may have limitations in multiple domains.  The effects of inattention and hyperactivity can impede the learning process and affect competence in many areas of life.  These effects can result in limitations in the domain of "Acquiring and using information"; for example, by undermining academic performance.
>
> > SSR 09-4p, 2009 WL 396033 at *3-4.

This interplay is echoed in SSR 09-3p, the Social Security Ruling pertaining to functional equivalence in the domain of acquiring and using information, which provides as follows:

> [c]hildren who have limitations in the domain of "Acquiring and using information" may also have limitations in other domains.  For example, mental impairments that affect a child's ability to learn may also affect a child's ability to attend or to complete tasks.  In such cases, we evaluate limitations in both domains of "Acquiring and using information" and "Attending and completing tasks."

As both SSR 09-4p and SSR 09-3p make clear,

> [r]ating the limitations caused by a child's impairment(s) in each and every domain that is affected is not 'double-weighting' of either the impairment(s) or its effects.  Rather, it recognizes the particular effects of the child's impairment(s) in all domains involved in the child's limited activities.

> SSR 09-4p, 2009 WL 396033 at *4; SSR 09-3p, 2009 WL 396025 at *4 (footnotes omitted).

In conducting her functional equivalence analysis in the present case, the ALJ first found that Plaintiff had a marked limitation in acquiring and using information based on the following evidence:

> [t]he claimant has a considerable history of significant learning difficulties.  She failed LEAP twice and has failed 4th grade twice.  She did participate in summer remediation and retook LEAP.  She was promoted to 6th grade and receives 504 Accommodation.  (Testimony)  She has a FSIQ in the Average range (97) and her achievement testing is below average in the areas of reading and mathematics.  The claimant meets the criteria for Reading Disorder and Mathematics Disorder. (Exhibit 4F/11 and 12)  She is currently being evaluated for special education placement/services.  (Testimony)

> (Tr. p. 35).

In the domain of attending and completing tasks, the ALJ then found that Plaintiff had a less than marked limitation, citing only the following:

> [t]he claimant meets the criteria for ADHD, combined type. (Exhibit 4F)  Claimant and grandmother both testif[ied] her symptoms are improved with medication.

> (Tr. p. 35).

This Court finds that the ALJ's assessment with regard to this domain was not supported by substantial evidence.  As set forth above and as summarized again below, the evidence demonstrates conclusively that Plaintiff had very serious difficulties attending to and completing tasks and required significant support to perform such tasks.  This

evidence establishes a finding of a marked impairment with regard to this domain.

Specifically, at the administrative hearing, Plaintiff testified that "sometimes" her medication helped her concentrate and other times it did not.  (Tr. pp. 59-60).  For her part, when asked about the effectiveness of Plaintiff's medication Ms. Jefferson testified that "... in the beginning it helped a little bit, but now she's back to, you know -- like for a month it was okay after that ... *it doesn't do anything for her.*"  (Tr. p. 68).  Upon further questioning by counsel, Ms. Jefferson agreed that the Vyvanse "... worked a little bit in the beginning" but even then Plaintiff had problems with focusing and understanding math and reading. (Tr. p. 70).  The ALJ's brief statement does not touch upon any of the evidence that has a bearing on the domain of attending and completing tasks, evidence  which "... generally entails consideration of how well the child is able to focus and maintain attention and begin, carry through, and finish activities, including the pace at which the child performs activities and the ease with which the child changes them."  *Raimondi, o/b/o R.R. v. Astrue*, No. 09-CV-2046; 2010 WL 4983672 at *3-4 (M.D. Fla. Dec. 2, 2010)(citing 20 C.F.R. §416.926a(h)).

In addition, the ALJ's analysis in the domain of attending and completing tasks fails to discuss the bulk of the findings of examining psychologist, Dr. Tropez-Arceneaux, perhaps the most authoritative source on the extent of Plaintiff's limitations, whose comprehensive report was issued after the initial level assessment that was performed by the Administration's non-examining PC.  *See, e.g., Kha Xiong ex rel. Pha Yang v. Astrue*, No. 07-CV-0202, 2008 WL 4196823 at *8 (E.D. Calif. Sept. 10, 2008).  There, test results obtained by the doctor placed Plaintiff in the very elevated range for hyperactivity and impulsivity, indicating that she had high activity levels, restlessness, impulsivity, difficulty

being quiet, and was easily excited; academic struggles including difficulty learning and remembering concepts, problems that seriously and very frequently affected her functioning in the academic setting and often in the social setting; and, "... clinically significant difficulties with inattention, learning problems, executive functioning, task completion, and impulsivity." (Tr. p. 263). And, despite being somewhat masked due to medication, "... symptoms of inattention and impulsivity were markedly noted throughout [the] testing." (Tr. p. 267).

The Court also notes that at her visit to Dr. Mamon some two months prior to the administrative hearing, increased disruptive behavioral issues were reported in the form of Plaintiff walking around in class yelling "hello" and generally being the "class clown." Similar conduct was noted in the Functional Report completed by Ms. Jefferson. Other recent behavioral incidents resulted in one suspension, expulsion proceedings, and Plaintiff being placed on probation for the remainder of the school year. A teacher's report from March 27, 2012 indicates that Plaintiff was working well below her grade level and required extended time and placement in a small group. All of these issues persisted despite the fact that special accommodations had been put in place by way of a IAP/504 Program and evaluation for Plaintiff's placement in special education services was reported at the administrative hearing. The need for such accommodations and special services is strongly suggestive of a marked impairment in the domain of attending and completing tasks. *Perkins v. Astrue*, ___ F.Supp. 2d ___, ___, 2012 WL 11575702 at *8 (N.D. N.Y. 2012).

As noted earlier, functional equivalence is established if a child has marked limitations in two of the six domains enumerated in §416.926a(b)(1). The ALJ having found that Plaintiff has a marked limitation in the domain of acquiring and using

information, a similar finding in the domain of attending and completing tasks would establish functional equivalence.   Because the evidence of record summarized above establishes that Plaintiff does indeed suffer from a marked limitation in attending and completing tasks, one that is more than moderate, it will be recommended that Defendant's motion for summary judgment be denied, that Plaintiff's motion for summary judgment be granted, and that Plaintiff's case be remanded to the Commissioner for an award of benefits.  *Perkins*, __ F.Supp. 2d at __, 2012 WL 11575702 at *10; *Kha Xiong*, 2008 WL 4196823 at *12.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Defendant's motion for summary judgment be denied, that Plaintiff's motion for summary judgment be granted, and that Plaintiff's case be remanded to the Commissioner for an award of benefits.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ___28th___ day of _____January_____, 2015.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

26